UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

LAVONNE "PENNY" LAMAR and
WILLIAM K. KEY,

       Plaintiffs,

v.                                       Case No: 1:14-cv-571-JDW-PWG

STATE OF ALABAMA DEPARTMENT
OF CONSERVATION AND NATURAL
RESOURCES, et al.,

       Defendants.

_____/

## ORDER

**BEFORE THE COURT** is the Report and Recommendation ("R&R") of the Magistrate

Judge recommending that William Key's Motion for Partial Summary Judgment (Dkts. 79, 80) be

denied, Defendants' Motions for Summary Judgment with Respect to Claims of Lavonne "Penny"

Lamar (Dkt. 86) be granted in part and denied in part, and Defendants' Motion for Summary

Judgment with Respect to Claims of William K. Key (Dkt. 88) be granted in part and denied in part

(Dkt. 137). After consideration of the R&R, Defendants' objections,[1] and a *de novo* review, the

recommendations in the R&R are adopted, as supplemented herein.[2]

---

[1] Plaintiffs did not file objections to the R&R. Two and a half months after the deadline, Plaintiffs filed a Response to Defendant's Objections simply stating they have no objection to a *de novo* review. (Dkt. 172).

[2] A district court may accept, reject, or modify a R&R. 28 U.S.C. § 636(b)(1). Those parts of an R&R to which objection is made are reviewed *de novo*. § 636(b)(1)(C); Fed. R. Civ. P. 72(b)(3). Objections must "pinpoint the specific findings that the party disagrees with." *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009). In the absence of specific objections, there is no requirement that findings be reviewed *de novo*. *Garvey v. Vaughn*, 993 F.2d 776, 779 n.9 (11th Cir. 1993). Nevertheless, the district court reviews the R&R for "clear error" even in the absence of objections. *Macort v. Prem, Inc.*, 208 Fed. App'x. 781, 784 (11th Cir. 2006). And legal conclusions are reviewed *de novo*, even in the absence of an objection. *See LeCroy v. McNeil*, 397 Fed. App'x. 554, 556 (11th Cir. 2010) (citing *United States v. Warren*, 687 F.2d 347, 348 (11th Cir. 1982)); *Cooper-Houston v. S. Ry. Co.*, 37 F.3d 603, 604 (11th Cir. 1994).

Key does not object to the dismissal of his official capacity Title VII and race discrimination claims against Greg Lein and Lisa Laraway in Counts I, II, IV, V, VI, and VII, his retaliatory hostile work environment claim against the Alabama Department of Conservation and Natural Resources ("DCNR") in Count II, his ADA claims in Counts V and VI, or his Rehabilitation Act claim in Count VI. Nor does Key object to the denial of his Motion for Partial Summary Judgment (Dkts. 79, 80).[3]

Lamar likewise does not object to the dismissal of her official capacity Title VII and race discrimination claims against Lein and Laraway in Counts I, II, III, and IV, her disparate treatment claim against DCNR in Count III, or her claim for constructive demotion against DCNR in Count IV. Accordingly, the R&R is adopted as to these recommendations.

Defendants filed an eighty-four page statement of objections to the R&R (Dkt. 138) concerning Lamar's claims for Retaliation in Violation of Title VII and Retaliatory Hostile Work Environment, and Key's claims for Retaliation in Violation of Title VII and Retaliation in Violation of the Rehabilitation Act.

### Preliminary observation

Lamar's and Key's respective claims of discrimination, retaliation and hostile work environment are fairly typical of employment discrimination cases. Notwithstanding , this case has become a quintessential example of out of control litigation.[4] The attorneys apparently do not

---

[3] Key brought a claim for constructive demotion in violation of Title VII in Count IV. His claim for constructive demotion is subsumed by his claim for retaliation in Count I. Constructive demotions are analyzed as adverse employment actions. *See, e.g., Crayton v. Alabama Dep't of Agric. & Indus.*, 589 F. Supp. 2d 1266, 1284-85 (M.D. Ala. 2008).

Key's and Lamar's Count VIII - Violation of § 1983 Fourteenth Amendment Failure to Supervise and Train and Count IX - Violation of § 1983 Fourteenth Amendment Violation of Procedural Due Process and Substantive Due Process and Key's Count X - Violation of § 1983 Fourth Amendment were dismissed with prejudice (Dkt. 73).

[4] A description of the pertinent summary judgment pleadings underscores this observation:
- (Dkt. 80):   Key's Motion for Partial Summary Judgment:   **40** pages
- (Dkt. 98):   Defendants' response:   **45** pages

appreciate that concise and thoughtful argument will more often than not result in sound and decisive

rulings, free from error and oversight.[5] The Magistrate judge, burdened by a voluminous evidentiary

record, multiple claims by two plaintiffs, three summary judgment motions, three responses and

three replies, did a herculean job of sifting through all of that. In their 84 pages of "objections,"

Defendants complain loudly, but unconvincingly, about his thoughtful and well reasoned

recommendations.[6] While there may be some factual misstatements in his recitation, his

---

| | | |
|---|---|---|
| - (Dkt. 120): | Key's reply: | **8** pages |
| - (Dkt. 87): | Defendants' summary judgment memorandum -Lamar: **84** pages | |
| - (Dkt. 102): | Lamar's response: | **51** pages |
| - (Dkt. 125): | Defendants' reply: | **74** pages |
| - (Dkt. 89): | Defendants' summary judgment memorandum- Key: **108** pages | |
| - (Dkt. 101): | Key's response: | **55** pages |
| - (Dkt. 126): | Defendants' reply: | **61** pages |

[5]"That writer does the most, who gives his reader the *most* knowledge, and takes from him the *least* time." C. C. Colton, A.M., Lacon; or Many Things in Few Words: Addressed to Those Who Think Preface xi (William Gowans ed., Revised ed.1849) (emphasis in original).

[6]To the extent any of Defendants' objections in their 84 pages are not expressly addressed, all other arguments and objections have been considered in the court's *de novo* review.
    Defendants' 84 page statement of objections includes general, non-specific objections, (Dkt. 138 at 3-7), and objections regarding facts "less essential to legal conclusions" that are frivolous, (*Id.* at 13-15). *See Marsden v. Moore*, 847 F.2d 1536, 1548 (11th Cir. 1988)(11th Cir. 2009) ("Frivolous, conclusive, or general objections need not be considered by the district court.") (citing *Nettles v. Wainwright*, 677 F.2d 404, 410 n. 8 (5th Cir. Unit B 1982)). Defendants also make objections that are repetitive of their original arguments (Dkt. 138 at 16-18, 37-38, 41-49, 62-75). *See Rodriguez-Gonzalez v. Astrue*, 854 F. Supp. 2d 176, 178 (D.P.R. 2012) ("[W]here the objections are repetitive of the arguments already made to the magistrate-judge, a *de novo* review is unwarranted. Instead, the report and recommendation is reviewed by the district judge for clear error.") (internal quotations and citations omitted); *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan*, 806 F.Supp. 380, 382 (W.D.N.Y.1992) ("It is improper for an objecting party to attempt to relitigate the entire content . . . by submitting papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the Magistrate Judge. Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a Report and Recommendation . . . .").
    Notwithstanding, a *de novo* review of the Defendants' repetitive arguments has been conducted, and does not lead this Court to disturb the Magistrate Judge's conclusions.
    Defendants object because the R&R did not explicitly address every argument they made in their hundreds of pages of briefing (*Id.* at 8-12, 19-32, 33-34, 36, 56-62, 70-75, 78-80). But, they cite no authority requiring a federal judge to explicitly address every argument presented in hundreds of pages of motions, responses, and replies. And any inference that the Magistrate Judge did not thoroughly consider each argument is rejected.
    Typical of the irrelevant commentary in their objections to the R&R, Defendants "object" to the Magistrate Judge's denial of summary judgment on claims not brought by the Plaintiffs (*Id.* at 49-56). But it was Defendants' own comment about "unpled claims" ("Plaintiff raised many claims in response to discovery . . . of which the Amended Complaint provides no notice whatsoever")(Dkt. 87, p. 82), which prompted the Magistrate Judge to say what he said

legal conclusions are spot on.

## I. Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A genuine factual dispute exists only if a reasonable fact-finder 'could find by a preponderance of the evidence that the [non-movant] is entitled to a verdict.'" *Kernel Records Oy v. Mosley*, 694 F.3d 1294, 1300 (11th Cir.

---

about "unpled claims."

    Defendants reiterate their objections to the reasonable inference of Commissioner Guy's knowledge of Key's charge of discrimination (Dkt. 138 at 62-70), urging the Court to rely only on a self-serving affidavit. But, as articulated by the Magistrate Judge, "there are genuine issues of fact on the basis of which a reasonable jury could conclude that Commissioner Guy as the decision-maker knew that Key had filed an EEOC complaint." (Dkt 137 at 39); *see Lippert v. Community Bank, Inc.*, 438 F.3d 1275, 1282 (11th Cir. 2006) ("The district court's contrary conclusion, which relied on the self-serving testimony of the decision-maker [in a Whistleblower Protection Act retaliation case], was error.")

    And the Court is perplexed by Defendants' argument that there is no evidence of the date on which the DCNR had notice of Key's Charge of Discrimination filed in February. (Dkt. 138 at 61). Indeed, Defendants direct the Court to their own counsel's letter to the EEOC, (*Id.* at 70 n. 47), which indicates that DCNR responded to the EEOC complaint on March 18, 2013. (Dkt. 116-20 at 2).

    Defendants also raise a number of new arguments that were not raised before the Magistrate Judge. The district court has the discretion to decline to consider arguments not raised before the magistrate judge. *Williams v. McNeil*, 557 F.3d 1287, 1291 (11th Cir. 2009). Indeed, "it would be fundamentally unfair to permit a litigant to set its case in motion before the magistrate, wait to see which way the wind was blowing, and - having received an unfavorable recommendation - shift gears before the district judge." *Id.* at 1292. For example, Defendants argue that Laraway's statements regarding Lamar are hearsay and that Lamar failed to show knowledge of alleged retaliatory acts with respect to other employees. (Dkt. 138 at 34-35, 39, 45 n. 35). These arguments were not raised before the Magistrate Judge in either their motion for summary judgment or their reply, (*See* Dkts. 86, 87, 125), and will therefore not be considered. *Williams*, 557 F. 3d at 1291-92.

    Defendants also argue that they could not properly respond to Key's Rehabilitation Act Retaliation Complaint because the Amended Complaint is a shotgun pleading (Dkt. 138 at 75-78). But Defendants answered the original complaint, answered the amended complaint, moved to amend their answer, moved to sever the claims, twice moved to continue the case, and moved for summary judgment, all without raising this contention, waiting until after the R&R was rendered. (*See* Dkts. 14, 32, 36, 39, 45, 50, 57, 86, 87, 88, 89). This objection will likewise not be considered. *See Williams*, 557 F.3d at 1292.

    Particularly perplexing is Defendants' objection to the Magistrate Judge's factual statements concerning Lamar's disparate treatment claim, a claim he recommends be dismissed.

    Finally, Defendants raise new facts regarding when DCNR received notice of Key's Amended Notice of Discrimination Charge. (Dkt. 138 at 14 n. 11, 62). But they provide no authority to support their implicit suggestion that a district court is required to review evidence that was not presented to the Magistrate Judge. Because this evidence was not before the Magistrate Judge, it will not be considered. *See Williams*, 557 F.3d at 1292 ("a district court 'is not required to [] consider evidence presented for the first time in a party's objection to the magistrate judge's recommendation") (quoting *United States v. Howell*, 231 F.3d 615, 621 (9th Cir. 2000) (alteration in original). And Defendants' request for leave to submit additional evidence (Dkt. 138, p. 1), is DENIED.

2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)). "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citations omitted). Facts are viewed and reasonable inferences are drawn in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007).

"A nonmoving party, opposing a motion for summary judgment supported by affidavits cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." *Avrigan v. Hull*, 932 F.2d 1572, 1577 (11th Cir. 1991). As such, the non-moving party's evidence "cannot consist of conclusory allegations or legal conclusions." *Id.* (citations omitted).

## II. Lavonne "Penny" Lamar

### A. Count I - Retaliation in Violation of Title VII

#### i. Material Facts

Penny Lamar began her employment with DCNR in 1985 and was assigned to Gulf State Park. (Lamar Dep. 9:10-20, Dkt. 90-18). In February 2007, she was appointed as Parks Facilities Operator. (Lamar Dep. 17:17-18:23, Dkt. 90-18). In April 2012, Lisa Laraway was hired as the Superintendent at Gulf State Park. (Laraway Aff. ¶ 3, Dkt. 90-4).

In June 2012, Lamar complained of race discrimination to William Key. (Lamar Dep. 78:11-79:8, 82:6-19, Dkt.90-18; Key Dep. 189:14-18, 240:7-241:7, Dkt. 90-55). At the end of October or early November 2012, Lamar complained to Harry Dwyer, the golf professional at the park, that she had been discriminated against. (Dwyer Personnel Board Test. 552:1-9, Dkt. 117-2).

In a December 17, 2012 email titled "Racial Discrimination at workplace," which recapped

her conversation with Dwyer on December 11, 2012 in which she complained about discrimination, retaliation, and hostile work environment, Lamar formally complained. (Lamar Email, Dec. 17, 2012, Dkt. 113-3). She sent the email to Dwyer, Greg Lein, Alabama State Parks Director, and Jeff Greene, Personnel Manager. (Lamar Email, Dec. 17, 2012, Dkt. 113-3). On December 18, 2012, the same email was sent and/or forwarded to Dwyer, Laraway, Randy Stults, park ranger and pier manager, Michael Guinn, assistant superintendent at Gulf State Park, and Lamar's counsel. (Dkt. 91-8).

On or about December 19th and 20th, Major Scott Bannon began investigating Lamar's complaints. He interviewed Stults and Laraway as part of his investigation. (Bannon Report, Dkt. 113-14). Bannon finalized his report on January 30, 2013, concluding that Lamar did not experience "apparent or overt racial discrimination or hostile work environment." (Bannon Report, Dkt. 113-14). During the course of the investigation, on January 10, 2013, Lamar emailed Stults requesting a meeting with him, Nicole Cabarrubia, Laraway's assistant, and Guinn "to discuss work related issues." (Lamar Email, Jan. 10, 2013, Dkt. 116-2). Stults forwarded Lamar's email to Laraway and in an email later that day told Laraway that "[t]his jazz is getting old with [Lamar]. lol [.]" (Stults Email, Jan. 10, 2013, Dkt. 116-2).

Trinese Lamar Wiley, Lamar's daughter and a Gulf State Park employee assigned to the pier, was sent home on February 19, 2013 by Stults. (Wiley Email, Mar. 13, 2013, Dkt. 83-16; Wiley Time Card, Dkt. 83-8). She was told not to come back until she was contacted. (Larway Email, Mar. 18, 2013, Dkt. 116-4). Stults testified that Wiley was terminated because of "[j]ob abandonment, 24 plus hours, no contact, no calling in." (Stults Dep. 65:9-12, Dkt. 90-25). He testified that "we had tried to call and couldn't make contact." (Stults Dep. 68:6-8, Dkt. 90-25).

Stults' testimony is expressly contradicted, however, by the testimony of Teresa Carlisle, the assistant manager of the pier. She testified that Stults changed the schedule, that Wiley was unaware of the schedule change, that Stults told her that if she called Wiley she would be fired, and that Wiley did not miss scheduled shifts.[7] (Carlisle Dep. 50:23-51:2, 53:4-9, Dkt. 118-7). And Wiley's formal termination was delayed because:

> I know this is not an excuse but a reason. With all that is going on with Penny and Bill this was a touchy situation that we needed to tip toe on. She didn't show up for work and when she did we told her to go home and we would contact her if we needed her. Then Penny starting snooping around and we just didn't want to do a formal termination until we let things rest a little. Once she emailed Randy and asked what we were doing is when he said she was terminated . . . .

(Laraway Email to Tim Wishum, the Operations and Maintenance Supervisor and copied to Stults, Mar. 18, 2013, Dkt. 116-4).

### ii. Discussion

To establish a prima facie case of Title VII retaliation, a plaintiff must show that "(1) she engaged in an activity protected under Title VII; (2) she suffered an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action."[8] *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). If a plaintiff establishes a prima

---

[7]   Q. Had there been earlier occasions when Trinese was scheduled to work at the pier and she didn't show up as scheduled?
A. No
Q. Are you positive about that?
A. Not any that I'm aware – that I can remember.

(Carlislie Dep. 53:4-9, Dkt. 118-7).

[8]Defendants object to the R&R's analysis regarding causation based on *Univ. of Tex. Sw. Med. Ctr v. Nassar*, which involved an appeal from a jury trial. *See* 133 S.Ct. 2517. Post *Nassar*, the Eleventh Circuit in an unpublished decision, has stated the following regarding causation:

About causation, "Title VII retaliation claims require proof that the [employer's] desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, 133

facie case, the burden shifts to the defendant to proffer a legitimate, non-retaliatory reason for the adverse employment action. *Coutu v. Martin County Bd. of County Com'rs*, 47 F.3d 1068, 1075 n. 54 (11th Cir. 1995). If defendant does so, the burden shifts to the plaintiff to establish that the proffered reasons were a pretext for retaliation. *Chapman v. AI Transp.*, 229 F.3d 1012, 1024–25 (11th Cir. 2000). In this respect, it must be evaluated "whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Silvera v. Orange Cty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir.1997)) (internal quotation marks omitted). If the plaintiff proffers sufficient evidence to create a genuine issue of material fact regarding whether the reasons were pretextual, the employer is not entitled to summary judgment. *Id.* at 1025.

Lamar presents evidence sufficient to state a prima facie case for retaliation. She engaged in protected activity as early as June 2012 and as late as December 17, 2012 when she complained of discrimination. Laraway and Stults learned of her protected activity on December 17th and 18th, respectively. Stults effectively terminated Lamar's daughter on February 19, 2013, just two months later. That was temporally sufficiently to Lamar's protected activity to create a material factual dispute as to causation. *Compare O'Neal v. Ferguson Const. Co.*, 237 F.3d 1248, 1253 (10th Cir.

---

S.Ct. 2517, 2528, 186 L.Ed.2d 503 (2013). A plaintiff may satisfy her burden of proving causation by demonstrating a "close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

*Luke v. Bd. of Trustees Florida A&M Univ.*, No. 15-13995, 2016 WL 7404677, at *3 (11th Cir. Dec. 22, 2016). *See also Banks v. iGov Techs., Inc.*, No. 15-14943, 2016 WL 5403590, at *5 (11th Cir. Sept. 28, 2016) (unpublished) ("As to the causation element, the protected activity must be a "but-for" cause of the adverse employment action.") (citing *Nassar*, 133 S.Ct. at 2534); *Long v. Alabama Dep't of Human Res.*, 650 F. App'x 957, 968-70 (11th Cir. 2016) (where plaintiff presented enough circumstantial evidence to raise a reasonable inference that an adverse action was taken against him, the question is for the jury to determine if the protected activity was a 'but-for' cause of his termination).

2001) (one and one half month period may establish causation), *with Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (three to four month gap is insufficient to show causation in Title VII retaliation case); *Thompson v. N. Am. Stainless*, LP, 562 U.S. 170, 175, 131 S. Ct. 863, 868, 178 L. Ed. 2d 694 (2011) (firing a close family member will almost always be an adverse employment action). Even if the two month delay was too long, it is not fatal, considering that additional evidence shows causation. *See Thomas*, 506 F.3d at 1364. A reasonable jury could draw an inference from Carlisle's testimony and Stults' email that Wiley was terminated because of Lamar's complaints of discrimination.

Defendants offer as the legitimate, non-retaliatory reason for Wiley's termination that she failed to report for her assigned schedule. However, Lamar proffers sufficient evidence to create a genuine issue of material fact as to whether Defendants' proffered legitimate, non-retaliatory reasons for Wiley's termination were pretextual. In the two months leading to Wiley's termination, Stults was interviewed by Bannon regarding Lamar's complaints, Stults stated that "this jazz with [Lamar] is getting old", and Carlisle testified that Stults changed the schedule without notice to Wiley and told her she would be fired if she called Wiley. (Bannon Report, Dkt. 113-14; Stults Email, Jan. 10, 2013, Dkt 116-2; Carlisle Dep. 50:23-51:2, 53:4-9, Dkt. 118-7). And after Wiley's effective termination, Laraway delayed her "formal termination" because "Penny start[ed] snooping around." (Laraway Email, Mar. 18, 2013, Dkt. 116-4).

Because the evidence is sufficient for a reasonable jury to find that Defendants' proffered reasons were prextual, Defendants Motion for Summary Judgment as to Lamar's Retaliation claim against DCNR will be denied.

9

## B. Count II - Retaliatory Hostile Work Environment

Lamar's retaliatory hostile work environment claim requires that she show she was subject to unwelcome harassment, that the harassment was based on her engaging in protected activity, and that it was sufficiently severe or pervasive to alter the terms and conditions of her employment. *See Kelly v. Dun & Bradstreet, Inc.*, 641 F. App'x 922, 923 (11th Cir. 2016) (citing *see Gowski v. Peake*, 682 F.3d 1299, 1311 (11th Cir. 2012)). The work environment must be subjectively perceived by her as hostile, and objectively perceived as hostile by a reasonable person. *Gowski*, 682 F.3d at 1311.

### i. Material Facts

#### a. Lamar's Perception

Lamar's December 7, 2012 "Employee Performance Midappraisal" signed by Stults and Laraway stated that she did a good job with customers in the park, that she would be provided additional training on the reservation system, and that she was instructed to use email to communicate with headquarters regarding reservations. Laraway and Stults learned of Lamar's formal complaint of discrimination on December 17 and December 18, 2012 respectively.

Lamar relies on a series of events between January 2013 and August 2013 in support of her claim that she suffered a retaliatory hostile work environment after complaining about discrimination.

On or about January 8, 2013, Laraway's assistant, Cabarrubia, falsely accused Lamar of failing to block reservations properly. (Lamar Aff. ¶ 60, Dkt. 118-4). During a phone call with Lamar the following day, Lamar "asked [Cabarrubia] if [Lamar] was the only one [Cabarrubia] was checking behind and [Cabarrubia] said yes[.]" (Cabarrubia Notes, Jan. 9, 2013, Dkt. 116-1).

On February 19, 2013, Lamar's daughter was sent home by Stults, effectively terminating

her. And on February 21, 2013, Stults drafted a statement memorializing a warning disciplinary action with Lamar on November 21, 2012, (Dkt. 112-13), but Stults provides no explanation for why the statement was drafted three months after the disciplinary action.

In March 2013, Lamar was transferred to the beach pavilion, but was not provided enough assistance for her responsibilities there. (Lamar Dep. 160:7-16, Dkt. 90-18). Previously, Lamar was allowed to hire seasonal workers but after her transfer, she was the only facility operator that could not hire seasonal workers. (Lamar Dep. 162:1-15, Dkt. 90-18; Lamar Aff. ¶ 63, Dkt. 118-4). Lamar had to request volunteers to assist at the pavilion from other departments, rather than having her own dedicated volunteers. (Lamar Dep. 164:1-23, 165:16-23, Dkt. 90-18).

On March 22, 2013, Lamar met with Laraway, Cabarrubia, and Stults concerning her use of volunteers to assist at the beach pavilion. (Lamar Dep. 145:11-148:23, Dkt. 90-18; Lamar Aff. ¶ 67, Dkt. 118-4). During the meeting, Laraway and Stults were "[s]creaming and hollering." (Lamar Dep. 149:8, Dkt. 90-18). Laraway was "sitting on her foot, on the couch, jumping up and down" and told Stults to "[t]ell her what her damn job is[.]" (Lamar Dep. 149:13-16, Dkt. 90-18).

On April 29, 2013, Lamar was told by Teresa Bailey, the assistant campground manager, that the pavilion was allowed one volunteer but that the pier manager loaned her the two pier volunteers to use at the pavilion. (Bailey Email, Apr. 29, 2013, Dkt. 91-10 at p. 36). On May 1, 2013, Laraway emailed "I was very clear that you were the only one person that was to be working in the booth during the week and the volunteers were to ONLY work on the weekend."[9] (Laraway Email, May

---

[9]But, Laraway's testimony contradicts her email:

Q. Around May of 2013, did you tell Penny Lamar that she was not to have volunteers except for on the weekends and when she was on leave?
A. No, she had volunteers, she had staff. It was at least four people that were volunteering and working at the beach pavilion.

1, 2013, Dkt. 91-10).

Lamar was isolated at the pavilion, could not take breaks, and became paranoid. (Lamar Dep. 168:1-23, Dkt. 90-18). She testified that Laraway "made it hard for [her] to cover or do her job" because she was the only one at the pavilion to handle the responsibilities. (Lamar Dep. 169:2-3, Dkt. 90-18)

In May 2013, Lamar received a performance appraisal score of 12, (Dkt. 113-8), a significant decrease from her past scores which averaged 35.6 over the prior five years. (*See* Dkts. 91-5, 91-6) (2008 - 37.1, 2009 - 37.1, 2010 - 37.1, 2011 - 34.2 , 2012 - 34.2).

In June 2013, Lamar was accused of failing to meet with a client regarding a pavilion reservation. (Lamar Aff. ¶ 79, Dkt. 118-4). However, the appointment was scheduled for Lamar's day off and it was not noted on Lamar's calendar. (*Id.*).

In July or August 2013, Lamar was reassigned to the pro shop to replace a seasonal clerk. (Lamar Dep. 184:12-19, 276:8-277:3, Dkt. 90-18). Although she maintained the title of Park Facility Operator, her reassignment of duties required "substantially fewer skills and responsibilities." (Lamar Aff. ¶ 84, Dkt. 118-4).

Finally, on August 17, 2013, Lamar was issued a written reprimand by Stults for missing the June 10, 2013 meeting with a guest regarding the pavilion meeting. (Dkt. 91-13). There is no explanation for why the written reprimand was issued two months after the incident.

---

Q. Were they allowed to work when she was there?
A. There were plenty of people working while she was there, yes.

(Laraway Dep. 275:2-12, Dkt. 90-20).

### b. Additional Park Employees' Perceptions

Additionally, Lamar presents testimony from four former employees of Gulf State Park and summaries by unidentified individuals to support her retaliatory hostile work environment claim. (Dkt. 102 at 39).[10]

### Harry Dwyer

Dwyer was the golf pro who operated the golf shop at Gulf State Park. (Dwyer Dep. 18:12-20, 23:11-19, Dkt. 90-11). During Laraway's first 90 days at Gulf State Park, he met with her privately. (Dwyer Dep. 49:4-10, Dkt. 90-11). During the meeting, Laraway said, "This park's in for a rude awakening," (Dwyer Dep. 51:12-17). Dwyer testified that she "made it perfectly clear that she can do anything that she wants, that she was given permission by [Deputy Commissioner] Curtis Jones." (Dwyer Dep. 269:14-16, Dkt. 90-11).

Dwyer met with Laraway regarding Lamar's job duties at the pro shop. (Dwyer Dep. 91:5-18). When Dwyer asked why Lamar, the only black facility operator and only black merit employee, was moved from the beach pavilion to a clerk position at the pro shop, Laraway told him that "Penny is not the right kind of people for that job." (Dwyer Dep. 92:9-18, 103:20-104:14, Dkt. 90-11). Dwyer believed Laraway had a racial bias against Lamar based on her treatment of Lamar, her statement regarding Lamar, her asking Lamar to do nominal duties, her failure to supply Lamar with training, tools, and proper personnel, and her demotion of Lamar. (Dwyer Dep. 96:14-97, Dkt. 90-11). He testified that "Penny wasn't being treated like the other employees." (Dwyer Dep. 176:19-23,

---

[10] Lamar identifies three other individuals who were not deposed and did not submit affidavits. (Dkt. 102 at p. 39). She also cites to a letter summarizing a review of complaints made by park personnel against Laraway. (Dkt. 106-5). The letter does not contain any details regarding the forty-five complaints/allegations of hostile work environment. (*Id.*). Without more, this letter provides no support for Lamar's claim.

Dkt. 90-11).

In August 2013, Laraway called Dwyer into a meeting with Guinn and told him that she was asking for his suspension. (Dwyer Dep. 221:21-222:3, Dkt. 90-11). Dwyer was told he was being insubordinate, that he was undermining Laraway, and that "[he] had no business whatsoever to talk about – or report[] her for Lamar and Key[]." (Dwyer Dep. 222:9-19, Dkt. 90-11).

Dwyer filed his own Equal Employment Opportunity Commission ("EEOC") claims in January and December 2014. (Dwyer Dep. 244-248, Dkt. 90-11). He resigned in January 2015. (Dwyer Dep. 25:1-3, Dkt. 90-11).

### Teresa Carlisle

Teresa Carlisle, a white female, was the assistant pier manager at Gulf State Park. (T. Carlisle Dep. 22:14-19; 29:21-23, Dkt. 118-7). She testified that the park "was very hostile." The examples she gave were the treatment of her daughter and that she heard that Laraway yelled and screamed at other people. (T. Carlisle Dep. 98-99, Dkt. 118-7).

According to Carlisle, in July 2013, Laraway fired her 16 year old daughter, Stephanie Carlisle ("Stephanie"), a white female, for sending an inappropriate text. (T. Carlisle Dep. 28-29, Dkt. 118-7). The night after Key's termination hearing, Laraway called Stephanie, who was at home with her mother. (T. Carlisle Dep. 27, Dkt. 118-7). Carlisle heard Stephanie crying and went to investigate. (T. Carlisle Dep. 27:16-17, Dkt. 118-7). While she was standing in Stephanie's doorway, she heard Laraway "screaming on the phone" and telling Stephanie "[d]on't ever come back to Gulf State Park." (T. Carlisle Dep. 27:14-21). Carlisle did not address Stephanie's termination with Laraway for "fear of retaliation of losing [her] job." (T. Carlisle Dep. 28:19-29:1).

Laraway never yelled or screamed at Carlisle, Carlisle's performance appraisals in 2010,

2011, and 2012 exceeded standards, and Carlisle did not have any concerns about her 2013 performance appraisal. (T. Carlisle Dep. 37-42, 90:10-12, Dkt. 118-7). She resigned in lieu of being terminated in December 2014.[11] (T. Carlisle Dep. 69-70, Dkt. 118-7).

Laraway testified that she saw a text that "basically said about things that were happening at [Key's termination] hearing," and that she told Stephanie to stay out "the Bill Key thing."[12] (Laraway Dep. 54:16-20, Dkt. 90-20).

### Glenda Malec

Glenda Malec was the account clerk at Gulf State Park. (Malec Dep. 10:6-9, Dkt. 90-21). She resigned because she "saw a lot of stuff that [she] didn't want to be a part of . . . politics, maybe." (Malec Dep. 10:20-11:2, Dkt. 90-21). Laraway never disciplined her and never yelled at her.[13] (Malec Dep. 19:4-7, Dkt. 90-21). On one occasion they "butted heads" regarding overtime at the park. (Malec Dep. 19:7-11, Dkt. 90-21). Subsequently, Malec successfully completed a probationary period and was made a permanent employee. (Malec Dep. 27:6-13, Dkt. 90-21).

Malec never heard about Lamar complaining of race discrimination and never heard Laraway

---

[11]Lamar argued that "Theresa Carlisle was demoted and eventually fired for her participation in Key's Hearing." (Dkt. 102 at p. 44). But, Key's hearing was in July 2013, Carlisle resigned in December 2014 not because of participation in Key's hearing but because Lynn Byrd accused her of going "into another employee's cash register and [doing] something." (T. Carlisle Dep., 25:2-4, Dkt. 118-7).

[12] Q. Did you tell Stephanie Carlisle that it was none of her business what happened and that she needed to stay out of the Bill Key thing?
A. I think I might have.
Q. Why would you tell her that?
A. Because I believed she – and I'm going to say I believed because I'm not sure exact wording or what the time line was, but I remember a sort of conversation because she was calling people around the park and telling them about everything that happened at the termination hearing.

(Laraway Dep. 53:22-54:11, Dkt. 90-20).

[13]Malec's testimony contradicts Lamar's contention that Malec "recounted hostility being directed at her" because of her participation in Key's hearing.

or Guinn talking about Lamar. (Malec Dep. 34:9-16, 34:21-22, Dkt. 90-21). While she never saw anything that she thought was race discrimination, she heard that the cleaning crew at the campground, predominately African American females, would complain about "not getting paid right". (Malec Dep. 39:5-23, Dkt. 90-21).

She testified that Laraway and Guinn were trying to push her out, but did not identify or describe anything done to her. (Malec Dep. 47:11-48:14, Dkt. 90-21). She could not recall the complaints she made regarding Laraway to the Montgomery office. (Malec Dep. 53:1-16). In short, Malec never complained about discrimination, contrary to Lamar's contention. (Dkt. 102 at 39).

### Teresa Bailey

Teresa Bailey worked in reservations and before resigning, reported Laraway in 2014 for reserving cabins for her personal use without paying for them. (Bailey Dep. 13-16, 315-317, Dkt. 90-8). She testified that she would not have reported the discrepancy had she not been leaving because "[her] life would have been a living hell. And if it wasn't my life was a living hell, [Laraway] would make sure my boss's life was a living hell or my employees were." (Bailey Dep. 317:3-9, Dkt. 90-8).

### Unidentified Individuals

Lamar cites Exhibit 18 (Dkt. 106-5) and Exhibit 32 (Dkt. 108-4) to further support her claim of retaliatory hostile work environment. But Exhibit 18 is a summary by an unidentified individual reviewing complaints about Laraway. (Dkt. 106-5). It does not contain any specific complaints regarding retaliatory hostile work environment and states that the "review of these 45 complaints/allegations characterized as being 'hostile work environment' situations found that none of these instances appears to have met the legal criteria for a hostile work environment." (*Id.*).

16

Exhibit 32 is an undated list of "serious problems" compiled by an unidentified "long time volunteer." (Dkt. 106-5). And Exhibit 32 includes primarily complaints about "Brent," a Grounds Superintendent. It does not contain any complaints about hostility or discrimination towards African Americans or complaints about retaliation after engaging in a statutorily protected activity.

### ii. Discussion

This circuit recognizes a retaliatory hostile work environment claim. *Gowski v. Peake*, 682 F.3d 1299, 1312 (11th Cir. 2012). To establish the claim, a plaintiff must show that "(1) [s]he engaged in a statutorily protected activity; (2) [s]he has been subject to unwelcome harassment; (3) the harassment was based on [her] engaging in the protected activity; and (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of [her] employment." *Kelly v. Dun & Bradstreet, Inc.*, 641 F. App'x 922, 923 (11th Cir. 2016) (citing *see Gowski*, 682 F.3d at 1311).

The plaintiff must subjectively perceive the environment as hostile and abusive but also establish that a reasonable person would perceive the same, considering the totality of the circumstances. *Gowski*, 682 F.3d at 1312. The four factors considered in determining whether the alleged harassing conduct is objectively severe are "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1276 (11th Cir. 2002).

As has been recognized, there is "a unique difficulty posed by allegations of retaliatory harassment." *Noviello v. City of Boston*, 398 F.3d 76, 92 (1st Cir. 2005). And it requires a "more nuanced analysis" than discriminatory harassment. *Id.* "It is only those actions, directed at a complainant, that stem from a retaliatory animus which may be factored into the hostile work

environment calculus." *Id.* at 93.

In *Gowski*, the court found sufficient evidence of a retaliatory hostile work environment where administrators instructed employees to encourage plaintiffs to resign, solicited reports against them, removed them from projects, limited their privileges, prohibited them from conducting research, gave them low evaluations, and reassigned them. 682 F.3d at 1313-14. Other circuits have recognized that false accusations of misconduct, work sabotage, denial of support, and exclusion may also contribute to the creation of a hostile work environment. *Noviello*, 398 F.3d at 93 (citing *O'Rourke v. City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001); *see Ray v. Henderson*, 217 F.3d 1234, 1245 (9th Cir. 2000); *Aviles v. Cornell Forge Co.*, 183 F.3d 598, 606 (7th Cir. 1999)).

Viewing the evidence in the light most favorable to Lamar, she has presented sufficient evidence to create an issue of material fact as to whether she was subjected to a retaliatory hostile work environment.

As early as June 2012 and as late as December 17, 2012, Lamar engaged in protected activity. Laraway and Stults learned of Lamar's protected activity in December. Just over a week before her protected activity, Stults' and Laraway's appraisal of Lamar stated "she did a good job with customers in the park[.]" However, two months later and nineteen days after Bannon closed his investigation of Lamar's and Key's complaints, Lamar's daughter was effectively terminated. In the months that followed, Lamar was isolated to the beach pavilion, denied assistance that other park operators received, falsely accused of misconduct but formally reprimanded months later, and her performance appraisal was drastically decreased. Her responsibility of coordinating pavilion rentals was removed. Lamar was unable to take breaks, became paranoid, and it became difficult for her to do her job. (Lamar Dep. 168:1-169:3, Dkt. 90-18). Ultimately, she was reassigned from overseeing

18

the pavilion and facility rentals to performing the duties of a seasonal clerk. (Lamar Dep. 160:7-16, 162:1-15, 184:12-19, 276:8-277:3, Dkt. 90-18; Lamar Aff. ¶¶ 63, 84, Dkt. 118-4; Dwyer Dep. 103:20-104:14, 92:9-18, Dkt. 90-11; Dkt. 113-8).

In sum, Lamar was reassigned, her duties were reduced, she was removed from responsibilities, given low evaluations, accused of misconduct, and isolated. *See Gowski*, 398 F.3d at 1313-14; *Noviello*, 398 F.3d at 93. And her co-employees testified that Lamar was treated differently, that they had "no business" reporting complaints of discrimination, and that they feared retaliation.

Although some of the conduct Lamar complains of could be considered isolated, petty, and trivial, viewing the evidence in the light most favorable to her, a reasonable jury could find that she was subjected to a retaliatory hostile work environment as a result of complaining about discrimination. Defendants' Motion for Summary Judgment as to Lamar's Retaliatory Hostile Work Environment claim against DCNR will therefore be denied.

### III. William Key

#### A. Count I - Title VII Retaliation

##### i. Material Facts

William Key began his employment with DCNR in 2001 and was assigned to Rickwood Caverns State Park as a Park Ranger. (Key Dep. 44:5-45:4, Dkt.90-55). Prior to April 2012, he was assigned to Gulf State Park. In April 2012, Laraway was hired as the Superintendent at Gulf State Park. (Laraway Aff. ¶ 3, Dkt. 90-4). On April 10, 2013, Key was terminated.

#### Summer 2012

Key testified that in the summer of 2012, Laraway was not satisfied with Lamar's work at

the pavilion. (Key Dep. 196:10-200:11, Dkt. 90-55). During a meeting he had with Laraway in June 2012 regarding Lamar, Laraway told him: "Consider yourself lucky. Imagine having employees like Penny times 80."[14] (Key Dep. 207:1-16, Dkt. 90-55). This was the only statement of Laraway that Key took as a reference to race. (Key Dep. 214:18-21, Dkt. 90-55).

In July 2012, Laraway asked Key to reprimand Lamar, which he refused to do because he thought it was unwarranted. (Key Dep. 204:1-205:16, Dkt. 90-55; Key Aff. ¶ 14, Mar. 11, 2016, Dkt. 118-2). He avers that he "questioned the directive and motivation of Laraway as discriminatory" and that "Laraway advised [him] at that time, 'If you don't get rid of her, I will.'" (Key Aff. ¶ 6, Apr. 2016, Dkt. 118-15).[15]

### September-October 2012

On September 4, 2012 Laraway sought instruction on the steps to take to "suspend and emoter [sic]" Key. (Laraway Email, Sept. 4, 2012, Dkt. 109-1). She was told to follow the progressive discipline process and send a recommendation to suspend without pay or terminate. (Wishum Email, Sept. 4, 2012, Dkt. 109-1). The progressive discipline process involves four steps: warning, reprimand, suspension, and termination. (Progressive Discipline Manual, Dkt 114-7 at pp. 25-41).

Key's performance appraisal on September 20, 2012 confirms that Key had been warned. (Dkt. 113-15 at p. 147). However, instead of following the progressive discipline process, on

---

[14]Defendants make a lengthy objection regarding this statement. Exactly what Laraway said will be a question for the jury, but the substance of Laraway's comment has been consistent throughout Key's testimony, verified answers to interrogatories, and affidavit. (*See* Dkt. 90-32 at p.10) ( "Imagine having to deal with an employee like Penny times eighty.") (*See* Dkt. 118-15 ¶ 5) ("Imaging having to deal with 80 Pennys."). The weight given to this statement based on Laraway's background of working at City Park in New Orleans is for the jury. (Laraway Dep. 21:15-16, Dkt. 90-20).

[15] Laraway testified that she did not remember directing Key to reprimand Lamar or Key questioning her motivations for directing the reprimand. (Laraway Dep. 110:2-15, Dkt. 90-20).

September 21, 2012, Laraway gave approval to Guinn to provide Key the option of either resigning or be terminated. (Key Dep. 115:23-119:13, Dkt. 90-55; Guinn Dep. 97:3-21, 115:12-116:10, Dkt. 117-21).[16] Key resigned, but retracted his resignation via text message later that day. (Key Dep. 121:8-12, Dkt. 90-55). Laraway removed him from the schedule until October 1, 2012. (Laraway Email, Sept. 26, 2012, Dkt. 109-4).

On October 1, 2012, Wishum recommended to Laraway that Key be suspended for two weeks. (Wishum Email, Oct. 1, 2012, Dkt. 109-4). On October 2, 2012 at 9:48 p.m., "the suspension letter [was] in the Commissioner's office waiting for his signature." (Weber Email, Oct. 2, 2012 9:48 p.m., Dkt. 110-1). Despite Defendants' contention that Commissioner Gunter Guy implemented Key's suspension, in an email to Wishum, Laraway detailed her meeting with Key on the morning of October 3, 2012. (Laraway Email, Oct. 3, 2012 11:32 a.m., Dkt. 110-1). Laraway, not Guy, told Key that he was suspended for two weeks without pay, that he could take it immediately, and she would require him to take mandatory leave if he appealed the suspension. (Laraway Email, Oct. 3, 2012 11:32 a.m., Dkt. 110-1). And Laraway immediately suspended Key. (Laraway Email, Oct. 9, 2012 11:10 a.m., Dkt. 110-1).

Notwithstanding, Key could not be suspended without a letter from Guy detailing the beginning and end date of the suspension. (Wishum Email, Oct. 9, 2012, 11:16 a.m, Dkt. 110-1) ("We cannot start his suspension until we send a letter from the Commissioner to him!!!!!"). On October 11, 2012, ten days after Laraway suspended Key, Guy provided Key with "formal notice" of the suspension which was already underway. (Dkt. 115-11).

---

[16]Key testified that "[Guinn] informed me that Lisa wanted [Guinn] to let [him] know that they were thinking of – or give me a choice of either termination or I could resign." (Key. Dep. 116:15-18, Dkt. 90-55). Guinn testified that "I told him I wanted to give him the opportunity to resign because I felt that Lisa may have enough to have him terminated and I didn't wanted him to go out like that." (Guinn Dep. 115:15-18, Dkt. 90-14).

### December 2012

On December 17, 2012, Key emailed Dwyer, copying his attorney, Lein, Laraway, and Greene, recapping a December 11, 2012 discussion regarding retaliation and discrimination directed at Lamar. (Key Email, Dec. 17, 2012, Dkt. 110-6). Key stated he was "pressured" by Laraway to issue reprimands to Lamar and had refused. (*Id.*). It is undisputed that this was Title VII protected conduct. (Dkt. 89 at p. 40).

### January Drug Test

On or about January 9, 2013, Laraway met with Bannon regarding his investigation of Lamar's and Key's complaints of discrimination and retaliation. (Laraway Email, Jan 9, 2013 11:05 p.m., Dkt. 113-15). Late that night, Laraway emailed Bannon regarding an incident with Key at the November firearms training. (Laraway Email, Jan. 9, 2013 11:05 p.m., Dkt. 113-15). A week later, at 7:17 a.m., Laraway detailed how she wanted to proceed in investigating Key's behavior in November at the firearms training. (Laraway Email to Guinn, Tim Whitehead, copying Wishum, Jan. 16, 2013 7:17 a.m. Dkt. 111-3). She wanted Key to be sent for a full drug test "because we have probable cause from his range behavior."[17] (*Id.*).

At 11:25 a.m., Wishum initiated an investigation into the November incident and directed that Key be drug tested. (Wishum Email, Jan. 16, 2013 11:25 a.m., Dkt. 111-3). The only basis for Key's random drug screen later that day was his behavior two months before at the range. (Guinn Email, Jan. 16, 2013, Dkt. 111-4; Dkt. 113-15 at p. 96). The drug test was "non-negative" and required "further testing." (Dkt. 113-15 at p. 96). On January 31, 2013, the drug screen came back

---

[17]Laraway had previously emailed Wishum, copying Greene and Guinn, asking about sending an employee for drug testing. (Laraway Email, Nov. 8, 2012 4:46 p.m., Dkt. 110-4).

positive for amphetamines.[18] (Dkt. 111-5).

## February 2013

On February 1, 2013, Key was referred to the State of Alabama Employee Assistance Program ("EAP"). (Dkt. 114-2). On February 6, 2013, the EEOC received Key's Charge of Discrimination against DCNR for discrimination, retaliation in violation of Title VII, retaliation in violation of the Rehabilitation Act, and discrimination in violation of the American Disabilities Act. (Dkt. 112-4).

On February 7, 2013, Key saw LMHC Trish Johnson, as directed by the EAP referral. (Key Aff. ¶ 46, Dkt. 118-15). Johnson's assessment was that Key's prescription medication will test positive for amphetamines, that he was "well within the necessary parameters for managing his medications" and that she "did not see any of the behaviors mentioned" at the firing range in November. (Johnson Assessment, Dkt. 123-13). Gary Tate, RN,  the Clinical Administrator of Behavioral Health Systems, Inc. ("BHS") which administers the EAP, discussed Johnson's assessment with the medical director of BHS and issued the following recommendation on February 13, 2013:

> Obtain and provide to you a written Return to Work recommendation from the physician who is prescribing his medications
> Fax a copy of the above Return to Work recommendation to BHS . . .
> Until cleared by his prescribing physician to do so, Mr. Key should not carry a weapon or drive a State vehicle.

(Tate Dep. 50:1-8, Dkt. 123-5; Tate Recommendation, Dkt. 123-8).

On February 11, 2013, Key saw Dr. Pollard at Gulf Coast Behavioral Medicine. On February

---

[18]Key's primary care physician, Dr. Gregory Funk, testified extensively that Key's prescription medication would test positive for amphetamine. (*See generally* Funk Dep., Dkt. 90-12)

13, 2013, Dr. Pollard provided a letter stating that Key was "fit for law enforcement duty & can return to work without restrictions." (Dkt. 123-9 at p. 3; Pollard Dep. 204:13-19, 220:17-23, Dkt. 117-27) (Dr. Pollard had been treating Key regularly since at least July 2012). On February 13, 2013, Dr. Funk, also confirmed by letter that Key was able to work in law enforcement. (Dkt. 123-9).

On February 14, 2013, Will Gunter, DCNR's General Counsel called Tate regarding his recommendations. (Tate Clinical Notes Feb. 14, 2013, Dkt. 123-13). Gunter wanted a doctor to evaluate Key, because he believed Key was receiving medications from different prescribers (Tate Clinical Notes Feb. 14, 2013, Dkt. 123-13) ("he thinks an MD may be better suited to evaluate"). On February 15, 2013, in accordance with Tate's first recommendation, DCNR received Key's prescribing doctors' recommendations that he could return to law enforcement work. (Dkt. 123-9).

On February 21, 2013, Key saw Dr. Shams at Gunter's request. (Dr. Shams Assessment, Dkt. 123-13). In Dr. Shams' assessment, the medications Key was taking were the same medications noted in Dr. Pollard's October 2012 records. (*Compare* Dr. Pollard's Records, Dkt. 123-4 at p. 19, *with* Dr. Shams Assessment, Dkt. 123-13 at p.18). Dr. Shams noted "reportedly these medications are prescribed by different prescribers, Dr. Funk and Dr. [Pollard]". (Dkt. 123-13 at p. 18). Dr. Shams opined that Key should be able to return to his employment as a ranger with a modification not to carry or use a firearm. (Dr. Shams Assessment, Dkt. 123-13 at p. 25).

### March 2013

Based on Dr. Sham's assessment, Tate updated his recommendation to DCNR on March 7, 2013. (Tate Amended Recommendation, Dkt. 123-13 at p. 9). The updated recommendation provided:

Return to work with the following modifications: Mr. Key should not be required to

24

carry/use firearms and extreme caution should be exercised when operating a motor vehicle. Both restrictions apply to work responsibilities while taking his currently prescribed medications.

(Tate Amended Recommendation, Dkt. 123-13 at p. 9). Further, he advised: "We will regularly monitor the employee's compliance with the recommended treatment plan and report to you." (Tate Amended Recommendation, Dkt. 123-13, p. 9).

Gunter called Tate regarding monitoring Key's compliance with the treatment. (Tate Dep. 71:7-12, Dkt. 123-5; Tate Clinical Notes, Dkt. 123-13). On March 12, 2013, Tate provided his second amended recommendation, removing the sentence regarding monitoring Key's compliance with the treatment plan. (Dkt. 123-13 at p. 7). Tate understood that Key's treating physicians would be relied upon for his treatment program. (Tate Dep. 65:10-18, Dkt. 123-5).

On March 13, 2013, approximately five weeks after receiving Key's charge of discrimination, the EEOC faxed a presubpoena letter to DCNR regarding his charge. (Key's EEOC Case Log, Dkt. 91-46 at p. 3; Dkt. 112-4). The same day, Wishum recommended to Guy that Key be terminated because of "work history and inability to perform essential functions of the job." (Wishum Memo, Mar. 13, 2013, Dkt. 112-11).

On March 15, 2013, Guy sent Key a notice of pre-dismissal conference for March 25, 2013, to be held in the "Commissioner's conference room" before Deputy Commissioner Curtis Jones. (Dkt. 114-2). The notice included "supporting documents" recommending Key's termination. (Dkt. 114-2). Despite Defendants' contention that Guy did not know about Key's December 2012 complaints (*see* Dkt. 138, p. 69 n. 46), Guy included Key's December 2012 complaint regarding retaliation and discrimination and Bannon's January 30, 2013 investigative report with the pre-

dismissal conference notice. (Dkt. 114-2 at pp. 68, 83).[19]

On March 25, 2013, Key and his attorney met with Jones, Gunter, and Jennifer Weber, DCNR's assistant deputy legal counsel, for the pre-dismissal conference. He discussed the substance of his February EEOC charge, including the discrimination related to Lamar, retaliation related to the Lamar reprimand directive, and discrimination as a result of his disability. (Pre-Dismissal Conference Tr. 28-30, Dkt. 123-12).

### April 2013

Key was terminated on April 10, 2013 "because of [his] history of poor work performance and [his] inability to perform an essential function of [his] job." (Termination Letter, Dkt. 116-16).

### ii. Discussion

As discussed *supra*, a prima facie case of Title VII retaliation requires 1) engaging in a protected activity, 2) an adverse employment action, and 3) a causal connection between the two.[20] *Crawford*, 529 F.3d at 970.  If a plaintiff establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate, non-retaliatory reason for the adverse employment action. *Coutu*, 47 F.3d at 1075 n. 54. If the defendant does so, the burden shifts to the plaintiff to establish that the proffered reasons were a pretext for retaliation. *Chapman*, 229 F.3d at 1024–25. If the plaintiff proffers sufficient evidence to create a genuine issue of material fact regarding whether the reasons were pretextual, summary judgment will not be granted in the employer's favor. *Id.* at 1025.

Key has presented sufficient evidence to create a genuine issue of material fact as to whether

---

[19] Indeed, Guy  does not dispute the reasonable inference that he learned of Key's December 2012 complaint in March 2013. (Guy Aff., Dkt. 90-3)

[20]*See supra* n. 8 regarding *Nassar*.

26

his protected conduct in July of 2012 was causally related to Laraway's resign or be terminated directive she gave to him just two months later, his removal from the schedule until October 1, 2012, and his suspension on October 3, 2012 without Guy's authorization. *Compare O'Neal*, 237 F.3d at 1253, *with Thomas*, 506 F.3d at 1364. Defendants do not proffer a legitimate reason for the resign or be terminated directive or the required mandatory leave or suspension.[21] Key has therefore presented sufficient evidence supporting a prima facie case for retaliation.

Key has also presented sufficient evidence that the drug test on January 16, 2013 was an adverse employment action and causally related to his protected activity in December. *O'Neal*, 237 F.3d at 1253; *see Adams v. City of Montgomery*, 569 F. App'x 769, 774 (11th Cir. 2014). Defendants' proffer that the legitimate non-retaliatory reason for the drug test was Key's alleged erratic behavior two months before at the range. But, although Laraway had inquired about drug testing an employee in November, DCNR did not act on Laraway's inquiry until after Key engaged in protected activity a second time, after Bannon began his investigation, two months after the alleged erratic behavior, and without any new allegations of erratic behavior. In short, a reasonable jury could find that the reason for the January drug test was retaliation for Key's protected activity. *See Chapman*, 229 F.3d at 1024-25.

Guy terminated Key on April 10, 2013. Key has established a material factual dispute as to whether Guy knew of his protected activity prior to his April 2013 termination and that the reasons for his termination were pretextual. As noted, although Guy avers that he did not know of either

---

[21]Defendants argue that the time between Key's protected conduct and his mandatory leave and suspension is too remote and that Guy was unaware of Key's protected activity. (Dkt. 126 at 25-26). But Laraway approved Guinn giving Key the option to resign or be terminated, she removed Key from the schedule, and she began Key's suspension before Guy approved it. A reasonable jury could therefore find that the actual decision maker was Laraway, not Guy.

Key's February 2013 or April 2013 EEOC[22] complaints, as discussed, the evidence considered in a light most favorable to Key establishes that by March 2013, he was aware of the substance of Key's complaints, since he included Key's December 2012 complaints and Bannon's investigative report with his notice scheduling the pre-dismissal conference. (Pre-Dismissal Letter - Supporting Documents, Dkt. 114-2). *See Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000). And while the termination was ostensibly based on Key's poor work performance and his inability to perform an essential function, Wishum testified that the primary reason was Key's inability to perform an essential function. (Wishum Personnel Board Test. 353:1-2, Dkt. 117-9). Notwithstanding, Key had never been disciplined for "poor work performance" until he engaged in protected activity. (*See* Key's Misc. Employment Records, 2006-2012, Dkt. 116-19). And, Key's inability to perform an essential function was disputed.

Finally, the BHS initial recommendation provided that Key could return to law enforcement work with physician approval, which he provided. When DCNR's counsel was not satisfied with BHS's initial recommendation, BHS conducted a second assessment and modified the recommendation to meet DCNR's approval. A reasonable jury could draw the inference that DCNR, under the guise of seeking a legitimate reason for termination, was retaliating against Key for his complaints about discrimination and retaliation. *See Chapman*, 229 F.3d at 1024–25. Defendants' Motion for Summary Judgment as to Key's Title VII Retaliation claim will therefore be denied.

---

[22]The April 2013 EEOC complaint is an "Amended Charge of Discrimination." (Dkt. 116-31 at 2). It was signed by Key on April 4, 2013. (Dkt. 116-31 at 2). EEOC submitted a request of information on the April 2013 complaint on April 17, 2013, seven days after Key was discharged. (DCNR's Response to the Amended Charge, Dkt. 116-20 at 2; EEOC; Key's EEOC Case Log, Dkt. 91-46, p. 3).

## B. Count V - Rehabilitation Act Retaliation

### i. Material Facts

For the sake of brevity, only the facts regarding Key's protected activity and adverse employment actions under the Rehabilitation Act are discussed.

### February- March 2013

On February 6, 2013, the EEOC received Key's Charge of Discrimination in which he complained of discrimination based on disability. (Dkt. 112-4). On March 13, 2013, the EEOC faxed a presubpoena letter concerning Key's EEOC charge to DCNR. (Key's EEOC Case Log, Dkt. 91-46, p. 3). On March 25, 2013, during the pre-dismissal conference in the Commissioner's conference room, Key complained that he was discriminated against as a result of his disability and requested an accommodation. (Pre-Dismissal Conference Tr. 30-31, Dkt. 123-12). On March 29, 2013, Gunter offered to suspend Key's termination to allow him to apply for disability. (Gunter Email, Mar. 29, 2013, Dkt. 116-14). The same day, Key's attorney requested a reasonable accommodation on his behalf. (Pilcher Email, Mar. 29, 2013, Dkt. 116-14).   On April 9, 2013, Key's attorney again requested an accommodation on Key's behalf and advised that Key was discontinuing the medications that caused the concerns. (Pilcher Email, Apr. 9, 2013, Dkt. 116-15). Key was terminated the next day. (Termination Letter, Dkt. 116-16).

### ii. Discussion

The Rehabilitation Act prohibits retaliation against those who oppose disability discrimination.  29 U.S.C. § 794(a), (d), 42 U.S.C. § 12203(a). It incorporates the anti-retaliation standards established by the American Disabilities Act (ADA). And ADA discrimination law applies to the Rehabilitation Act. *Holbrook v. City of Alpharetta, Ga.*, 112 F.3d 1522, 1526 n. 2 (11th Cir.

29

1997). Retaliation claims under the ADA and the Rehabilitation Act are analyzed using the same framework as Title VII. *Id.*; *Stewart v. Happy Herman's Cheshire Bridge*, 117 F.3d 1278, 1287 (11th Cir. 1997).

In February and March 2013, Key engaged in protected activity when he complained he was being discriminated against because of his disability. And he requested accommodations on March 25, March 29, and April 9, 2013. *See Standard v. A.B.E.L. Servs. Inc.*, 161 F.3d 1318, 1328 (11th Cir. 1998) (holding a request for reasonable accommodation is statutorily protected activity if the plaintiff had a good faith, objectively reasonable belief that he was disabled). Key suffered an adverse employment action when he was terminated on April 10, 2013.

At the risk of being repetitive, while Guy disputes whether he had knowledge of Key's EEOC claims, on March 25, 2013, Key detailed the substance of his EEOC claim, including his claim of disability discrimination, in the pre-dismissal meeting in Guy's conference room. (Pre-Dismissal Conference Tr. 30-31, Dkt. 123-12). Guy acknowledged the meeting, it was taped, and he had access to the entire file. (Termination Letter, Dkt. 116-16; Wishum Personnel Board Test. 350:23-351:1, Dkt. 117-9). Four days later, DCNR's general counsel offered to suspend Key's termination to allow him to apply for disability.

A reasonable jury could find that Guy knew about Key's disability discrimination complaints and requests for accommodation. *See Brungart v. BellSouth Telecommunications, Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) (awareness can be established by circumstantial evidence). And, as discussed *supra*, Key has proffered sufficient evidence to create a material factual dispute as to whether the proffered reasons for his termination were pretextual.

**IV. Conclusion**

After consideration of the R&R in conjunction with a *de novo* review, the recommendations of the Magistrate Judge are adopted and confirmed.

1.  Plaintiff Key's Motion for Partial Summary Judgment (Dkt. 79) is **DENIED**.

2.  Defendants' Motion for Summary Judgment with Respect to Claims of Lavonne "Penny" Lamar (Dkt. 86) is **GRANTED** on her official capacity claims against Greg Lein and Lisa Laraway (Counts I, II, III, and IV), and her disparate treatment and constructive demotion claims against the DCNR (Counts III and IV). The motion is **DENIED** on her Title VII claims of Retaliation and Retaliatory Hostile Work Environment against the DCNR (Counts I and II).

3.  Defendants' Motion for Summary Judgment with Respect to Claims of William K. Key (Dkt. 88) is **GRANTED** on his official capacity claims against Greg Lein and Lisa Laraway (Counts I, II, IV, V, VI, and VII), and his claims against the DCNR for retaliatory hostile work environment (Count II), ADA violations (Counts V and VI), and violation of the Rehabilitation Act claim (Count VI). Defendants' motion (Dkt. 88) is **DENIED** on his Title VII retaliation claim (Count I) and Rehabilitation Act retaliation claim (Count V) against the DCNR.

**DONE AND ORDERED** this ___8th___ day of February, 2017.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to: Counsel of Record